**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: __________________**

NABIL HASCHEMIE, individually and on behalf of all others similarly situated,

Plaintiff,

v. JURY TRIAL DEMANDED

CINCO SPIRITS GROUP, LLC, a Delaware limited liability company,

Defendant.
________________________________________/

# NATIONWIDE CLASS ACTION COMPLAINT

Plaintiff, Nabil Haschemie ("Plaintiff"), brings this class action against Defendant, Cinco Spirits Group, LLC, a Delaware limited liability company ("Defendant"), on behalf of all consumers that have purchased falsely marketed tequila from Defendant's Cincoro tequila brand.

## I. INTRODUCTION

1. In the world of tequila, the *tequilana weber* blue variety of agave ("Blue Weber agave") is regarded as the gold standard. Indeed, the Blue Weber agave variety is the sole variety used in the production of true tequila. Blue Weber agave is native to Jalisco, Mexico and certain surrounding areas.

2. Blue Weber agave production is highly regulated, and consumers pay a premium for agave spirits made from 100% Blue Weber agave as a result. By way of example, Blue Weber agave takes longer to harvest because it must be grown and harvested once the plants reach full maturity (which can take 5 to 10 years). The plants must also be grown and harvested within certain areas, and specific traditional harvesting practices must be employed. These restrictions are enforced by the Tequila Regulatory Council and are meant to protect the authenticity and quality

of tequila and ensure that tequila produced outside the designated geographic regions cannot be labeled as such.

3. Tequila is made from the heart of the blue agave plant, commonly referred to as the piña. The piña is heated to break down its complex sugars, and crushed to extract its sugary juice, which is then fermented with yeast, transforming those sugars into agave-derived ethanol (alcohol), which is distilled into tequila.

4. Defendant markets the Cincoro tequila brand as "the gold standard in tequila," stating "[at] Cincoro, our journey begins with the meticulous hand-selection of the highest quality, mature 100% Tequilana Blue Weber agaves from both the Highlands and Lowlands of Jalisco."[1]

5. The Cincoro tequila brand carries seven agave spirits that Defendant categorizes as "100% de Agave" on the face of the bottles: Blanco, Reposado, Añejo, Gold, Extra Añejo, Añejo Cristalino, and AC Milan (collectively "Cincoros Tequilas" or the "Products").[2] All of the Products begin with the initial distillation of Cincoro Blanco, which serves as the foundation for the entire line of Cincoros Tequilas.




[1] https://www.cincoro.com/our-story/ (last visited August 25, 2025).
[2] https://www.cincoro.com/buy-now/tequilas (last visited August 25, 2025).







6. Defendant's website directs consumers who click a "Shop" button to purchase bottles of Cincoro for prices between $89.99 and $1,724.99 per bottle.[3]

7. Defendant further represents that "to craft the world's finest tequila, we hand-select the highest quality 100% Blue Weber agave from both the Highland and Lowland regions of Jalisco, México."[4]

8. Further, as evidenced on a bottle purchased by Plaintiff, Defendant prominently labels its Products' bottles as containing 100% agave ("100% de Agave"), and explains that "100% de Agave refers to origin of alcohol."

[3] https://www.cincoro.com/buy-now/
[4] *See, e.g.*, http://cincoro.com/expression/blanco/ (last visited August 25, 2025).




9. Plaintiff and others similarly situated paid premium prices for the Products in reliance on Defendant's representations that the Products were created from 100% Blue Weber agave.

10. The Product's "sleek design is further enhanced by the iconic, hand-polished stopper, inscribed with 'Share Truth.'" According to Defendant, "[t]his phrase embodies the essence of Cincoro's mission to create moments of genuine connection and authenticity through the shared experience of exceptional tequila."[5]

[5] https://www.cincoro.com/our-story/

11. But the truth is that Plaintiff failed to receive the premium, authentic Products promised by Defendant despite paying premium prices. Indeed, testing of the Products has uncovered that they contain material amounts of ethanol *not derived from agave plants*, and, as such, they were enhanced with ethanol other than that obtained from *tequilana weber* blue variety agave.

12. If Plaintiff and others similarly situated had known the truth of the ingredients in the Products, they would not have purchased the Products or would have paid less for them, and still hope to purchase these products in the future when they are truly 100% agave. For these reasons, and as further detailed below, Plaintiff brings this claim on his own behalf and on behalf of other consumers of Defendant's Products.

## II. PARTIES

**Plaintiff**:

13. Plaintiff is a resident and citizen of Florida and is otherwise *sui juris*. As detailed below, Plaintiff purchased various Products from retail, liquor stores, bars and restaurants authorized to sell the Products in Florida, such as Total Wine & More, for several years. Specifically, in August 2025, Plaintiff purchased a bottle of Cincoro Blanco from Total Wine & More. *A true and correct copy of Plaintiff's receipt for this transaction is attached as Exhibit A.*

14. Plaintiff purchased these Products after performing online research to identify premium and pure tequila and reviewing the Products' labels in store. Plaintiff purchased these Products, in material part, because they purportedly were created from 100% Blue Weber agave. Prior to purchase, Plaintiff read and relied on Defendant's representation that the Products were "100% Tequilana Blue Weber." When Plaintiff purchased the Products Tequilas, he was unaware that Defendant had misrepresented the composition and ingredients of the Products, such that he would not have purchased the Products or would not have paid as much for them as he did.

Plaintiff, at all times, believed, as a result of Defendant's representations both online and on the packaging of the Products he purchased, that the tequila he purchased was premium and pure tequila made of 100% Blue Weber agave. Had Plaintiff known the Products were not 100% Blue Weber agave, he would not have purchased the Products or would have paid less than he did.

**Defendant**:

15. Defendant is a Delaware limited liability company headquartered in New York and manufactures and markets the Products at issue in this litigation. Defendant engages in business throughout the United States.

## III. JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this class action under 28 U.S.C. § 1332(a)(1) because Plaintiff has a good-faith basis for an amount in controversy that exceeds the sum or value of $75,000, exclusive of interest and costs, and because the matter is between citizens of different states. In addition, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2)(A) of the Class Action Fairness Act of 2005 because: (i) there are 100 or more putative class members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is total diversity because Plaintiff and Defendant are citizens of different states.

17. This Court has personal jurisdiction over Defendant because it has substantial aggregate contacts with this District, including engaging in conduct in this District that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including by marketing and selling the Products to consumers in this Judicial District, by placing the Products into the stream of commerce directed at this Judicial District, and because Defendant purposely availed itself of the laws of the State of Florida by marketing and distributing the Products within Miami-Dade County, Florida and the State of Florida. Defendant's

purposeful availment and extensive contacts with Florida renders the exercise of jurisdiction by this Court over it permissible under traditional notions of fair play and substantial justice.

18. In accordance with 28 U.S.C. § 1391, venue is proper in this District because Defendant transacts business within this District and Defendant has intentionally availed itself of the laws and markets within this District.

19. All conditions precedent to this action have occurred, been performed, or have been waived.

## IV. FACTUAL ALLEGATIONS

20. ***Defendant and the Tequila Market.*** Tequila's popularity among consumers stems from several factors including its versatility; its perception as a "healthier" or "cleaner" choice than other spirits; a growing trend of consumers seeking authentic and premium beverage experiences; its cultural connection to Mexico; and the significant role of social media marketing and celebrity endorsements in expanding tequila's appeal. Defendant's leadership has stated that its founders saw that "there was an opportunity in the market to create a new tequila, a better tequila."[6]

21. ***The Regulation of Tequila Manufacturing and Labeling.*** Like champagne and cognac, tequila is a product of *origin*. Tequila can only legally be made in Mexico: specifically, in the states of Jalisco, Tamaulipas, Nayarit, Michoacán and Guanajuato. Mexico regulates the manufacturing of tequila through the Tequila Regulatory Council, *Consejo Regulador del Tequila,*

[6] https://www.forbes.com/sites/chloesorvino/2019/09/16/the-inside-story-of-how-michael-jordan-and-four-nba-owners-launched-the-super-premium-tequila-brand-cincoro/

*A.C.* ("CRT"), which is the Conformity Assessment Body for NOM-006-SCFI-2012-Alcoholic Beverages-Tequila-Specifications ("Tequila NOM").[7]

22. The Tequila NOM in section 6.1.1.1 states that the addition of sugar-based syrups "must not be more than 1% in relation to the total Tequila weight before it is bottled."

23. Under section 5.1.1 of the Tequila NOM, a product labeled "100% agave [azul]" or "100% de agave" is "a product whose fermentation may not be enhanced with sugars other than those obtained from the *tequilana weber* blue variety Agave grown in the territory specified in the Declaration" (i.e., in the states of Jalisco, Tamaulipas, Nayarit, Michoacán and Guanajuato).

24. "100% agave" tequila, as expressly defined in NOM 5.1.1 is different from "Tequila" as defined in NOM 5.1.2. A key distinguishing difference between 100% agave tequila and "tequila" is that "tequila" may have "other sugars in a proportion not to exceed 49% of total reducing sugars expressed in units of mass. This maximum enhancement of up to 49% of total reducing sugars expressed in units of mass may not be done with sugars from any species of Agave." However, "[t]he 51% of total reducing sugars expressed in units of mass may only be enhanced with *tequilana weber* blue variety agave . . . ." *See also* NOM section 6.3 (only authorizing tequila that is not 100% agave azul from being "enhanced with other sugars in the fermentation process").

25. As such, to be labeled as "100% de agave," "100% puro de agave," "100% agave," or "100% puro agave" the product *may not be enhanced with sugars* other than those obtained from the *tequilana weber* blue variety of agave grown in a specific, defined territory.

---

[7] *Official Mexican Standard NOM-006-SCFI-2012 Alcoholic Beverages -Tequila - Specifications Courtesy Translation*, https://www.crt.org.mx/wp-content/uploads/2024/01/NOM-006-SCFI-2012%20-%20INGLES.pdf.

26. In short, no sugars other than those obtained from the *tequilana weber* blue variety should be found in a tequila labeled as 100% agave.

27. Lastly, section 6.5.2.1 requires strict documentation to ensure that tequila "has not been adulterated in the manufacturing stages of its production."

28. A tequila labeled as 100% agave will be deemed to have been adulterated in the manufacturing stages of its production if it was not made exclusively from Blue Weber agave sugars. The presence of other sugars impacts the tequila's quality and taste given that the use of other sugars can alter the natural flavor profile of tequila.

29. Bottles of agave spirits that fail to provide accurate information in interstate commerce violate the Federal Alcohol Administration Act ("FAAA"), 27 U.S.C. § 205(e), which requires bottles to provide the "identity and quality of the products" and "the alcoholic content thereof," and 27 U.S.C. § 205(f), which requires advertisements of distilled spirits to "provide the consumer with adequate information as to the identity and quality of the products advertised."

30. Tequila is additionally regulated in the United States by the U.S. Department of the Treasury, Alcohol and Tobacco Tax and Trade Bureau pursuant to 27 C.F.R. Part 5, which regulates the labeling and advertising of distilled spirits.

31. An agave spirit can only be categorized as tequila where it is "made in Mexico, in compliance with the laws and regulations of Mexico governing the manufacture of Tequila for consumption in that country." 27 C.F.R. § 5.148.

32. A distilled spirit made from agave plants may only contain added flavoring or coloring materials if they "do not total more than 2.5 percent by volume of the finished product." 27 C.F.R. § 5.155.

33. ***Widespread Reports of Tequila Adulteration.*** Tequila manufacturing requires the cultivation, fermentation, and distillation of Blue Weber agave, and because this type of agave

takes five to ten years to mature for harvest, this "creates ongoing tension in the industry, as well as the temptation to cut corners."[8]

34. According to Remberto Galván Cabrera, a spokesperson for the Mexican Agave Council, "when agave prices were high, large tequila companies began mixing cane alcohol into tequila that they sold as 100% agave."[9] These practices have not ceased.[10]

35. Consumers have also raised their suspicions that there is significant adulteration of tequila that is exported from Mexico through social media, community-driven forum-style websites, and blind tasting tests.

36. ***Nuclear Magnetic Resonance Testing Confirms Adulteration of the Products.*** To verify the falsity of Defendant's representations, Plaintiff commissioned Nuclear Magnetic Resonance ("NMR") laboratory testing to confirm, by way of carbon isotope ratio analysis, whether the Products purchased by Plaintiff have been adulterated with cane alcohol.

37. This technique, which is widely accepted in food chemistry, identifies the plant origin of ethanol in a spirit by measuring the natural carbon fingerprint of the ethanol in the spirit. This fingerprint—known as a stable carbon isotope ratio ($\delta^{13}C$) –can be used to identify the plant source of the sugars used in fermentation.

38. Specifically, the carbon composition is analyzed at two parts of the ethanol molecule: the methylene group ($CH_2$) and the methyl group ($CH_3$). Ethanol made from Blue Weber

---

[8] Felisa Rogers, *What are you drinking? Agave farmers allege tequila industry corruption*, Mezcalistas (Jan. 13, 2025), https://www.mezcalistas.com/tequila-industry-corruption/.
[9] Felisa Rogers, *Agave farmers say they will no longer play nice*, Mezcalistas (Jan. 15, 2025), https://www.mezcalistas.com/breaking-tequila-news/.
[10] *See id.*

agave, a CAM49 plant, shows a distinct isotope signature compared to cheaper feedstocks like corn or sugarcane, which are $C_4$ plants.[11]

39. A foundational 2010 study confirmed this distinction and the ability to differentiate authentic 100% agave tequila when applying the analysis to tequila products. When applied to tequila, this technique detects the adulteration of tequila labeled as 100% agave by identifying the presence of ethanol made from a source other than Blue Weber agave. By way of example, ethanol made from $C_4$ plants such as corn and sugarcane consistently shows $\delta^{13}C(CH_2)$ values near –13.5‰.[12] In contrast, agave-derived ethanol falls within a range of –7.0‰ to –9.0‰.[13]

40. The results of the testing commissioned by Plaintiff confirmed that Plaintiff purchased tequila from Defendant that did not meet the United States' or Mexico's regulatory requirements for tequila labeled as 100% agave. Plaintiff tested a tequila sample purchased from a retail store in the United States, which yielded the following result: Cincoro Blanco $\delta^{13}C(CH_2)$ value of --12.3 (± 0.5)%. As such, the isotopic parameters measured were not in agreement with the tested samples' description of 100% agave.

41. The testing results for Cincoro Blano implicates the entire range of the Products as they are created from the same base spirit.

42. Plaintiff purchased the Products based on Defendant's representations and would not have paid premium prices but for Defendant's false and misleading statements and omissions.

43. Plaintiff intends to purchase Defendant's Products again under the current labeling once they understand the products to truly contain 100% agave and seek the Court's assistance by

---

[11] *See* Freddy Thomas, et al., *Improved Characterization of the Botanical Origin of Sugar by Carbon-13 SNIF-NMR Applied to Ethanol*, 58 J. AGRIC. FOOD CHEM. 11580, 11580-81 (2010).
[12] *Id.* at 11583.
[13] *Id.*

way of injunctive relief to ensure that Defendant's representations regarding its Products are accurate.

## V. <u>TOLLING ALLEGATIONS</u>

44. Plaintiff and other Class members reasonably relied on Defendant's representations and could not have discovered, through the exercise of reasonable due diligence, that Defendant was misrepresenting and concealing the true nature of the Products.

45. On or about January 13, 2025, agave spirit journalist Felisa Rogers with *Mezcalistas.com* published the English-language article, *Is that really tequila you're buying? Allegations of corruption raise serious questions*.[14] This article covered the prior week's large-scale, peaceful protest by agave farmers in the historic central square of Tequila, Jalisco, where members of the Mexican Agave Council, and *agaveros* (agave farmers) from several states convened to make demands on the tequila industry, including *inter alia:* "*NO MAS TEQUILA ADULTERADO!!!"* (translation- NO MORE ADULTERATED TEQUILA!!!), and "*EL TEQUILA DEVE SER 100 % AGAVE!!"* (translation-TEQUILA MUST BE 100% AGAVE!!").[15]

---

[14] Felisa Rogers, *Agave farmers say they will no longer play nice*, Mezcalistas (Jan. 15, 2025), https://www.mezcalistas.com/breaking-tequila-news/.
[15] *Id.*



*Hundreds of protesters gathered to protest alleged tequila industry corruption*

46. Only after that public protest and the subsequent coverage by *Mezcalistas* and other trade publications, could Plaintiff or other Class members reasonably have learned of the adulteration of purported 100% agave tequila with other forms of alcohol.

47. For these reasons, the applicable statutes of limitations for all claims should be tolled until at least January 13, 2025.

## VI. CLASS ALLEGATIONS

48. Plaintiff brings this action individually and as representatives of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the below-defined classes:

**A.** **The Nationwide Class:** All persons in the United States who purchased one or more of the Products during the applicable statute of limitations period.

**B.** **The Florida Subclass:** All persons who purchased one or more of the Products in Florida during the applicable statute of limitations.

49. Excluded from each class are Defendant, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; the judicial officers and their immediate family members and

associated court staff assigned to this case; and persons who properly execute and file a timely request for exclusion from the Class.

50. The classes described in this Complaint may be jointly referred to as the "Class" or "Classes" and members of the proposed classes may be jointly referred to as "Class members." Plaintiff reserves the right to amend or modify the Class definitions with greater specificity, further division into subclasses, or with limitation to particular issues as discovery and the orders of this Court warrant. In addition, the Court can define the Classes and create additional subclasses as may be necessary or desirable to adjudicate common issues and claims of the Class members if, based on discovery of additional facts, the need arises.

51. Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making final injunctive relief or corresponding declaratory relief and damages appropriate with respect to the Classes as a whole. Defendant continues to falsely market the Products as tequila made from 100% agave despite using sugars that were not derived from the Blue Weber agave variety.

52. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

53. As set forth in detail below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

**Numerosity/Manageability**

54. This action satisfies the requirements of Rule 23(a)(1). The members of the Class are so numerous that individual joinder of all Class members is impracticable. On information and belief, Class members number in the thousands. Defendant sells at least tens of thousands of cases of its tequila Products each year. The precise number or identification of members of the Class is

presently unknown to Plaintiff, but may be ascertained from (i) Defendant's books and records, (ii) the books and records of third-party retailers that maintain records of Class member purchases and contact information, and (iii) industry statistics. By way of example, upon information and belief, Florida is the third largest consumer of tequila in the United States.[16]

55. Plaintiff anticipates providing appropriate notice to Class members in compliance with Rule 23. By way of example, Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, email, text messages, social media, online advertisements, and/or published notice.

**Commonality**

56. This action satisfies the requirements of Rule 23(a)(2) and 23(b)(3) because there are questions of law and fact that are common to each member of the Classes. These common questions predominate over any questions affecting only individual Class members. The predominating common or Class-wide fact questions include, without limitation:

a. Whether Defendant's marketing of their tequila Products was likely to deceive or mislead reasonable consumers;

b. Whether Defendant was negligent in marketing their Products as 100% Blue Weber Agave;

c. Whether Defendant engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices by marketing their Products as 100% Blue Weber agave;

d. Whether Defendant was unjustly enriched;

e. Whether Defendant violated the consumer protection statutes and common law causes of action alleged herein; and

[16] Jan Conway, *U.S. Tequila Consumption 2023, By State*, Statista (Feb. 13, 2025), https://www.statista.com/statistics/486797/tequila-consumption-united-states-by-state/#:~:text=In%202023%2C%20tequila%20consumption%20in,ranking%20second%20and%20third%20respectively.&text=Tequila%2C%20an%20agave%2Dbased%20distilled,beverages%20in%20the%20United%20States.

f. Whether damages, restitution, equitable, injunctive, declaratory, or other relief is warranted.

**Typicality**

57. This action satisfies the requirements of Rule 23(a)(3) because Plaintiff's claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same wrongful conduct of Defendant.

58. Each Class member purchased one or more of Defendant's tequila Products and thus as a result has sustained, and will continue to sustain, damages in the same manner as Plaintiff. The relief Plaintiff seeks in this action is typical of the relief sought for the absent Class members.

**Adequacy of Representation**

59. This action satisfies the requirements of Rule 23(a)(4). Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is committed to the vigorous prosecution of this action and there is no hostility or conflict between or among Plaintiff and the unnamed Class members. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

60. To prosecute this case, Plaintiff has chosen the undersigned law firm, who has substantial experience in the prosecution of large and complex class action litigation and has the financial resources to meet the costs associated with the vigorous prosecution of this type of litigation. Plaintiff and his counsel will fairly and adequately protect the interest of all Class members.

**Superiority/Predominance**

61. This action satisfies the requirements of Rule 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members. The joinder of individual Class members is impracticable because of the vast number of Class members who own or have purchased any of the Products.

62. Because the monetary damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation, and to Defendant, by even a small fraction of the Class members, would be enormous.

63. In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class member. The benefits to the legitimate interests of the parties, the court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation. Class adjudication is simply superior to other alternative procedures for handling the class action given the particular circumstances.

64. Plaintiff is unaware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. The damages or other financial detriment suffered by Plaintiff and the Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Rule 23 provides the Court

with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.

## VII. CLAIMS FOR RELIEF

### COUNT I – COMMON LAW NEGLIGENCE
**(On behalf of Plaintiff and the Nationwide Class against Defendant)**

65. Plaintiff incorporates by reference paragraphs 1 through 64 as though fully set forth herein.

66. Defendant knew that despite being marketed, certified, advertised, and labeled 100% agave, the Products were adulterated or improperly enhanced with sugars other than those obtained from the *tequilana weber* blue variety of agave grown in a specific, defined territory.

67. Defendant owed Plaintiff and the Nationwide Class the duty of reasonable care, which they breached.

68. Specifically, Defendant owed a duty to Plaintiff and the Nationwide Class members to disclose that the Products are not 100% agave because it possessed exclusive knowledge that the Products were adulterated, intentionally concealed the true nature of the Products, and made misleading representations regarding the source of the sugars used in the Products. Defendant further owed a duty to ensure that the Products were not adulterated.

69. Defendant breached the duty owed to Plaintiff and the Nationwide Class in intentionally concealing material facts regarding the true nature of the Products, making misleading representations regarding the nature of the Products, and otherwise failing to disclose the same.

70. Defendant's knowing, intentional, or otherwise reckless misrepresentations and omissions were material in that a reasonable consumer would have considered them important in deciding whether to purchase the Products. Indeed, Plaintiff reviewed, considered, and relied on

Defendant's representations that the Products were 100% agave in deciding whether to purchase them. Plaintiff and the Nationwide Class members' reliance was reasonable.

71. Absent Defendant's misrepresentations and omissions, Plaintiff and the Nationwide Class members would not have purchased the Products or would not have paid premium prices for the Products.

72. As a result of Defendant's breach of its legal duties, Plaintiff and the Nationwide Class members suffered actual damages, that arose from the natural and foreseeable consequences of Defendant's conduct, in that the adulterated Products were not 100% agave, and, therefore, were not worth the premium price Plaintiff and Nationwide Class members paid.

**COUNT II – NEGLIGENT MISREPRESENTATION**
**(On behalf of Plaintiff and the Nationwide Class against Defendant)**

73. Plaintiff incorporates by reference paragraphs 1 through 64 as though fully set forth herein.

74. Defendant represented on its website and elsewhere that it used 100% Blue Weber agave to create the Products.

75. Defendant further misrepresented that its tequilas are "[b]orn from a mission to craft the world's finest tequila" made from a process in which Defendant "hand-select the highest quality 100% Blue Weber agave from both the Highland and Lowland regions of Jalisco, México."

76. Defendant additionally misrepresented that they utilize a "meticulous production process" that "includes slow cooking the agaves and slow distillation, ensuring a depth of flavor that sets Cincoro apart."

77. Further, Defendant misrepresents on its Products' bottle labels that the Products contain 100% agave ("100% de Agave") and take care to include the explanation that "100% de Agave refers to origin of alcohol."

78. Defendant has continued to make these misrepresentations of material facts to date.

79. At the time, Defendant either knew or should have known it was making misrepresentations of material facts or made the representations without knowledge of their truth or falsity.

80. Defendant's misrepresentations were made with the intent to induce consumers to purchase its tequilas over its competitors' tequila products who did not offer 100% agave tequilas.

81. These misrepresentations of fact concerned the type of information upon which Plaintiff and other reasonable consumers would be expected to rely in making their decisions to purchase Defendant's Products.

82. Consequently, Plaintiff and the Nationwide Class have suffered injury by purchasing Defendant's Products and not receiving what was advertised.

**COUNT III – UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Nationwide Class against Defendant)**

83. Plaintiff incorporates by reference paragraphs 1 through 64 as though fully set forth herein.

84. Plaintiff and the Nationwide Class members conferred benefits upon Defendant.

85. Plaintiff and the Nationwide Class members paid money for the Products, which they would not have purchased or would not have purchased at the same price, had they known that they were enhanced with sugars other than those obtained from the *tequilana weber* blue variety of agave.

86. Defendant has unjustly retained the benefits conferred upon by Plaintiff and the Nationwide Class members.

87. Defendant retained those benefits under circumstances that make it inequitable for Defendant to retain such benefits.

88. Defendant retained these benefits even though the Products were enhanced with sugars other than those obtained from the *tequilana weber* blue variety of agave.

89. If Plaintiff and Nationwide Class members had known the true nature of the Products, they would not have purchased the Products.

**COUNT IV – VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), FLA. STAT. § 501.201 *ET SEQ*.**
**(On behalf of Plaintiff, Nabil Haschemie, and the Florida Subclass against Defendant)**

90. Plaintiff, Mr. Haschemie incorporates by reference paragraphs 1 through 64 as though fully set forth herein.

91. Mr. Haschemie and the Florida Subclass members are "consumer[s]" engaged in "trade or commerce" within the meaning of FDUTPA. § 501.203 (7), (8), Fla. Stat.

92. Defendant engages in "trade or commerce" within the meaning of FDUTPA. § 501.203(8), Fla. Stat.

93. FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1), Fla. Stat.

94. Defendant engaged in unfair and deceptive trade practices that violated FDUTPA, by representing that their Products were 100% agave, ultra-premium, pure tequila made of 100% Blue Weber agave.

95. Defendant knew or should have known that its representations of the nature and composition of its Products were false but failed to disclose this information to consumers.

96. Defendant knew that such information was material to consumer transactions and consumers' decisions to purchase the Products.

97. Defendant actively concealed and misrepresented the true nature of how their Products were manufactured and composition of their Products. Indeed, Defendant concealed and

misrepresented that it had in fact utilized sugars other than those obtained from the *tequilana weber* blue variety of agave to enhance its tequila, despite the Products being labeled as 100% agave.

98. Defendant intended for Mr. Haschemie and the Florida Subclass members to rely on its misrepresentations and omissions so that Plaintiff and the Florida Subclass members would purchase the Products.

99. Defendant's unfair or deceptive acts or practices, including concealing, omitting, or suppressing material facts about the composition of the Products had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to, and did in fact, deceive reasonable consumers, including Plaintiff and the Florida Subclass members, about the quality and true value of the Products.

100. Defendant intentionally and knowingly misrepresented or omitted material facts regarding the use of Blue Weber agave with an intent to mislead Mr. Haschemie and the Florida Subclass members into believing that 100% Blue Weber agave was used to ferment the Products.

101. Defendant knew or should have known that its conduct violated the FDUTPA.

102. Plaintiff and the Florida Subclass members were and are injured as a result of Defendant's conduct because they paid to own and enjoy 100% agave, ultra-premium, tequilas. Instead, Plaintiff and the Florida Subclass members received and overpaid for agave spirits whose fermentation was enhanced by sugars other than those obtained from the *tequilana weber* blue variety agave grown in the requisite territory.

103. Defendant's failure to disclose, and active concealment of, the sugars used to ferment the Products, inclusive of the actual amount of Blue Weber agave actually used was material to Plaintiff and the Florida Subclass members.

104. Plaintiff and the Florida Subclass members have suffered ascertainable losses as a result of Defendant's misrepresentations and omissions about the Products. Had they been aware

of the true nature of and composition of the Products, they either would have paid less for the Products or would not have purchased the Products. Plaintiff and the Florida Subclass members did not receive the benefit of their bargain due to Defendant's misconduct.

105. As a direct and proximate result of Defendant's violations of FDUTPA, Plaintiff and the Florida Subclass members have suffered injury-in-fact and actual damages.

106. Plaintiff and the Florida Subclass members are entitled to recover their actual damages under § 501.211(2), Fla. Stat. and attorneys' fees under § 501.2105(1), Fla. Stat.

107. Plaintiff and the Florida Subclass members have suffered and will continue to suffer irreparable harm if Defendant continues to engage in such deceptive, unfair, and unreasonable practices.

108. Plaintiff, on behalf of the Florida Subclass, requests that the Court award them actual damages and issue an order requiring Defendant to properly notify the Florida Subclass members of the true nature of how the tequila Products are made and the amount of Blue Weber agave used to make them, as well as award Plaintiff and Florida Subclass members' attorneys' fees; and any other just and proper relief available under FDUTPA.

109. Plaintiff, on behalf of the Florida Subclass, further seeks an injunction to prohibit Defendant from continuing to engage in the false, misleading, and deceptive advertising and marketing practices complained of herein.

## VIII. CLAIMS FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, respectfully requests that the Court:

a. Certify the proposed Classes, appoint Plaintiff as the class representative, appoint Plaintiff's Counsel as Class Counsel, and make such further orders for the protection of Class Members as the Court deems appropriate;

b. Enjoin Defendant from engaging in the unlawful conduct alleged herein, and order such other injunctive relief that the Court deems just and proper;

c. Award compensatory damages to Plaintiff and the Class Members, including punitive damages, statutory damages, costs, and disgorgement in an amount to be determined at trial;

d. Award Plaintiff and Class Members pre-judgment and post-judgment interest, as provided by law,

e. Award Plaintiff and Class Members their reasonable attorneys' fees and costs as allowed by law;

f. Enter an order holding Defendant financially responsible for all Class notice and the administration of Class relief; and

g. Grant Plaintiff and the Class Members any other relief as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to *Fed. R. Civ. P.* 38(b), Plaintiff demands a jury trial for any and all issues triable by a jury.

Dated: August 27, 2025.

Respectfully submitted,

**RENNERT VOGEL MANDLER &**
**RODRIGUEZ, P.A.**
*Counsel for Plaintiff*
*and the Proposed Class*
Miami Tower, Suite 2900
100 S.E. Second Street
Miami, Florida 33131
Telephone (305) 577-4177
servicedanielmaland@rvmrlaw.com
servicesandramejia@rvmrlaw.com

*/s/ Daniel S. Maland*
Daniel S. Maland, Esq.
Florida Bar No. 114932
dmaland@rvmrlaw.com
Robert M. Stein, Esq.
Florida Bar No. 93936
rstein@rvmrlaw.com
Sandra E. Mejia, Esq.
Florida Bar No. 1026047
smejia@rvmrlaw.com